STATE OF MAINE

YORK, ss.

SUPERIOR COURT
CIVIL ACTION
DOCKET NO. RE-09-016

WALTER R. STUNGER and
LAURIE G. MACDONALD-STUNGER
f/k/a LAURIE G. MACDONALD,

Plaintiffs

v.

ORDER

DONALD SMITH and
ROSE ANN SMITH, et al.,

Defendants

Walter R. Stunger and Laurie G. MacDonald-Stunger initiated this action against Donald Smith and Rose Ann Smith to foreclose on a Bond for Deed and declare the parties' rights in the right-of-way known as Crystal Lane. Parties-in-interest Timothy R. and Judith A. Foster move for summary judgment confirming their right to park cars in the right-of-way pursuant to an easement. Following hearing the motion will be Granted.

## BACKGROUND

This action arises principally from a dispute regarding the rights of use and ownership between the owners of three separate parcels of property in Old Orchard Beach, Maine. Crystal Lane perpendicularly intersects Union Avenue one lot inland from the beach and connects Union Avenue with Ocean Avenue to the southwest.[1] (Supp. S.M.F. ¶ 6, Ex. E.) Crystal Lane is recorded as an improved, but unaccepted,

---

[1] Crystal Lane was formerly known as Surf Street. (Supp. S.M.F. Ex. C.)

private way that was laid out in the common plan of A.D. Morse, dated May 1904. (Add'l S.M.F. ¶ 22.) Crystal Lane benefits multiple properties. (Supp. S.M.F. ¶ 27.)

The Stungers currently occupy the lot at 1 Union Avenue, located at the seaward side of the intersection of Crystal Lane and Union Avenue. (Supp. S.M.F. ¶¶ 2, 19, Ex. E.) They hold the property pursuant to a Bond for a Deed executed with the Smiths on June 26, 1991, and operate a small, seasonal motel on the site. (Supp. S.M.F. ¶ 2, Ex. B; Add'l S.M.F. ¶ 26.) The Smiths acquired 1 Union Avenue from Pauline Melnick on January 28, 1983, who had in turn acquired the property in 1965. (Add'l S.M.F. ¶ 23.)

The Fosters own the property at 3 Union Avenue, situated directly across Crystal Lane from the Stungers' lot at 1 Union Avenue. (Supp. S.M.F. ¶¶ 1, 19.) The Fosters purchased their lot from the Smiths through Pepperell 1031 Facilitators, LLC, in May 2005. (Supp. S.M.F. ¶ 1; Add'l S.M.F. ¶ 25.) The Fosters' deed contains a covenant to keep the right-of-way between 3 Union Avenue and "other real estate now or formerly of Pauline F. Melnick . . . open and clear at all times, subject to an existing garage located partially within the [right-of-way]." (Add'l S.M.F. ¶ 24.) The Smiths acquired 3 Union Avenue from Pauline Melnick on October 30, 1981, subject to a covenant substantially similar to that contained in the deed to the Fosters. (Add'l S.M.F. ¶ 24.) Ms. Melnick purchased the property in 1972 from Emma Witcher, who had owned the land since 1934. (Supp. S.M.F. ¶ 24; Add'l S.M.F. ¶ 23.) The building at 3 Union Avenue contains two units. (Supp. S.M.F. ¶ 28.)

Jill Snow owns the property at 3 Crystal Lane, which is adjacent to the Stungers' lot at 1 Union Avenue on the seaward side of the right-of-way. (Supp. S.M.F. ¶ 3.) Ms. Snow acquired her property from Robert J. Melnick, her grandfather, on January 8, 2003, through a deed of distribution executed by herself and her grandfather's personal representative. (Supp. S.M.F. ¶ 3, Ex. C.) The Melnicks acquired the property on May

2

29, 1959, though it is not clear whether the property was held in Robert or Pauline Melnick's name. (Add'l S.M.F. ¶ 23.)

Immediately adjacent to the Fosters' property at 3 Union Avenue are a garage and a driveway made of gravel and concrete. (Supp. S.M.F. ¶ 21.) These are partially located in Crystal Lane. (Supp. S.M.F. ¶ 21.) The garage was originally built in 1928, and was demolished and rebuilt on the same location in 2002. (Supp. S.M.F. ¶ 23.) The property has been operated as a seasonal rental since at least 1972, and its owners have allowed tenants to regularly use the garage and driveway for off-street parking. (Supp. S.M.F. ¶¶ 29, 35; Add'l S.M.F. ¶ 32.) While Mr. Melnick was alive, he would often sit in his car and blow his horn if a tenant happened to block access to Crystal Lane. (Add'l S.M.F. ¶ 33.)

The Stungers knew that the garage at 3 Union Avenue was located partially in Crystal Lane when they entered the Bond for a Deed in 1991. (Add'l S.M.F. ¶ 49.) Between 1991 and 2004 the Stungers regularly complained to the Smiths about tenants parking in Crystal Lane, and the Smiths would tell them to speak with the rental agent. (Add'l S.M.F. ¶ 50.) In 2003 Attorney David Ordway, a lawyer with the firm of Smith, Elliot, Smith and Garmey, advised the Smiths that legal action would be taken to prevent their tenants from parking in Crystal Lane if they continued to do so. (Add'l S.M.F. ¶ 21.) These problems continued after the Fosters purchased the property in 2005, and became recurrent in 2006. (Add'l S.M.F. ¶¶ 39, 48.) Attorney Ordway had sent the Fosters a letter in 2004, before they purchased the property, warning them that parking in Crystal Lane would not be tolerated. (Add'l S.M.F. ¶ 20.) The Stungers complained to the Fosters about people parking in the driveway, but the situation did not improve. (Add'l S.M.F. ¶¶ 48, 51.)

3

Jill Snow, represented by the law firm of Smith, Elliot, Smith and Garmey, filed a lawsuit against the Fosters in 2007. (Add'l S.M.F. ¶ 40.) The suit sought to require the Fosters to keep Crystal Lane "clear and open." (Add'l S.M.F. ¶ 40.) On August 31, 2007, the Smiths executed a quitclaim deed conveying to the Fosters "any and all remaining interest that [they] might have in and to the reserved private right of way known as Crystal Lane . . . ." (Add'l S.M.F. ¶ 7.) The Stungers knew that Ms. Snow was suing the Fosters, but did not wish to become involved. (Add'l S.M.F. ¶ 3.)

On July 10, 2008, the Stungers contacted Attorney Ordway to inquire about exercising their rights under the Bond for Deed. (Add'l S.M.F. ¶ 1.) They had secured financing and were interested in paying off the Bond. (Add'l S.M.F. ¶ 2.) The Stungers learned that parking rights in Crystal Lane were the subject of Ms. Snow's lawsuit against the Fosters around this time. (Add'l S.M.F. ¶ 41.)

Attorney Ordway received an abstract of title for 1 Union Avenue on August 21, 2008, which revealed the quitclaim deed the Smiths had executed a year earlier. (Add'l S.M.F. ¶ 7.) The Stungers' title insurance company declined to insure access to 1 Union Avenue over Crystal Lane due to this quitclaim, and their prospective lender consequently ordered funds to be held in escrow until insurance was secured. (Add'l S.M.F. ¶¶ 8–9.) On that day, Attorney Ordway sent a letter to the Smiths demanding that they secure a deed from the Fosters releasing back the rights in Crystal Lane. (Add'l S.M.F. ¶ 10.)

The Smiths signed and recorded a "Corrective Release Deed" on September 12, 2008. (Add'l S.M.F. ¶ 12.) By a letter received on September 18, 2008, the Fosters' attorney told Attorney Ordway that this corrective deed conveyed only the land underlying the garage and driveway on which the Fosters claimed "exclusive use," and did not preclude use of the remainder of Crystal Lane. (Add'l S.M.F. ¶ 13.) Attorney

4

Ordway sent a letter on September 22, 2008, indicating that this was not an acceptable remedy, and subsequently learned that the Fosters were standing firm in their claim to the garage and driveway. (Add'l S.M.F. ¶ 14–15.) The jury-waived trial in Ms. Snow's lawsuit began one month later on October 20, 2008. (Supp. S.M.F. ¶ 7.)

The trial included testimony by Ms. Snow, Mr. Foster, Ms. Smith, and a neighbor who had resided at that location since 1970. (Supp. S.M.F. ¶¶ 7–9.) Mr. Stunger was listed as one of Ms. Snow's witnesses, but he did not testify. (Supp. S.M.F. ¶ 11.) Following trial, the court found that:

> Dorothy Cook, now age 86, testified that she has either lived adjacent to the Foster property or spent summers in this neighborhood continually since 1939. She was friendly with Emma Witcher, who resided in the Foster property year round from 1934 to 1972. The property included a garage and a gravel/concrete driveway which, the parties agree, intrudes into the right of way. Ms. Cook testified that Ms. Witcher and all the subsequent owners of the property used the driveway as access to the garage and as parking for tenants. . . . During this period, Ms. Snow's grandfather worked cooperatively with his neighbors, including the previous owners of the Foster property, to insure that vehicles parked on the driveway did not otherwise obstruct the use of the right of way. This long-standing historical arrangement permitted the Foster property to provide off-street parking to seasonal tenants—essential during summer in Old Orchard Beach—without unreasonably interfering with the use of the right of way.
>
> . . . Ms. Whitcher's [sic] year-round use of the garage and driveway from 1934 to 1972 was actual, open, visible, notorious, hostile, under a claim of right and continuous throughout that period.

(Supp. S.M.F. ¶¶ 14–15 (quoting *Snow v. Foster*, YORSC-RE-07-065 at 2 (Me. Super. Ct., Yor. Cty., Dec. 17, 2008) (Brennan, J.)).) The Fosters had "clearly established they have acquired a prescriptive easement for the use of [their] garage and the driveway . . . ." (Supp. S.M.F. ¶ 15; *Snow v. Foster*, YORSC-RE-07-065 at 2 (Me. Super. Ct., Yor. Cty., Dec. 17, 2008) (Brennan, J.).)

Ms. Snow appealed the judgment to the Law Court, and the Law Court affirmed the trial decision. (Supp. S.M.F. ¶ 16.) Specifically, the Court held that there was:

sufficient record evidence that supports both the court's finding that a prior owner of the Foster property acquired the prescriptive easement and its determination that the scope of the easement permits parking for two vehicles in the driveway. . . . Additionally, the court did not commit clear error in not finding subsequent unity of title to the servient and dominant estates in support of [Ms.] Snow's argument that the prescriptive easement had been extinguished by operation of the merger doctrine.

(Supp. S.M.F. ¶ 17; *Snow v. Foster*, Mem-09-179 (Sept. 30, 2009).)

The Stungers filed their original complaint against the Smiths and the Fosters on February 10, 2009, while Ms. Snow's appeal was pending.[2] (Add'l S.M.F. ¶ 18.) The complaint alleges that the Smiths encumbered the Stungers' title to 1 Union Avenue when they granted the Fosters whatever interest they held in Crystal Lane, and thus breached the Bond for a Deed. The Stungers request varying forms of relief, all of which require the court declare that the Fosters do not have the right to park cars on the portion of their driveway that encroaches into Crystal Lane.[3] The Stungers admit that this is the exact same relief that Ms. Snow sought in her case. (Supp. S.M.F. ¶ 18.)

The Fosters filed this motion for summary judgment on April 12, 2010, asserting that the judgment in Ms. Snow's case conclusively establishes their right to park cars in their driveway and bars the Stungers from relitigating the issue. They alternatively argue that the evidence shows that they have an easement in the portion of the driveway passing over Crystal Lane and that the Stungers have abandoned any rights they might have to the same. The Stungers request that the court render judgment against the Fosters.

---

[2] Neighboring property owners with lots adjacent to Crystal Lane were later joined as defendant parties-in-interest. These are Denis J. and Deborah E. Litalien, and Robert C. and Jean N. Waltz.

[3] The Stungers also seek a judgment of foreclosure to ascertain the payoff amount on the Bond for a Deed and compel the Smiths to sell. The motion before the court does not reach this issue.

## DISCUSSION

Summary judgment is appropriate where there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. M.R. Civ. P. 56(c); *see also Levine v. R.B.K. Caly Corp.*, 2001 ME 77, ¶ 4, 770 A.2d 653, 655. Judgment "may be rendered against the moving party" when appropriate. M.R. Civ. P. 56(c) (2009).

The critical question in this lawsuit is whether this court's prior judgment against Jill Snow precludes the Stungers from challenging the existence of the Fosters' prescriptive easement over Crystal Lane. "The doctrine of res judicata is a 'court-made collection of rules designed to ensure that the same matter will not be litigated more than once.'" *N.E. Harbor Golf Club, Inc. v. Town of Mount Desert*, 618 A.2d 225, 227 (Me. 1992) (quoting *Beegan v. Schmidt*, 451 A.2d 642, 643–44 (Me. 1982)) Res judicata has two components: claim preclusion, and issue preclusion. *Penkul v. Matarazzo*, 2009 ME 113, ¶ 7, 983 A.2d 375, 377 (quoting *Macomber v. MacQuinn-Tweedie*, 2003 ME 121, ¶ 22, 834 A.2d 131, 138). "Claim preclusion prevents relitigation if: (1) the same parties or their privies are involved in both actions; (2) a valid final judgment was entered in the prior action; and (3) the matters presented for decision in the second action were, or might have been litigated in the first action." *Id.* (quoting *Portland Water Dist. v. Town of Standish*, 2008 ME 23, ¶ 8, 940 A.2d 1097, 1099) (quotations omitted).

Issue preclusion, also referred to as collateral estoppel, "prevents the relitigation of factual issues already decided if the identical issue was determined by a prior final judgment, and the party estopped had a fair opportunity and incentive to litigate the issue in a prior proceeding." *Beal v. Allstate Ins. Co.*, 2010 ME 20, ¶ 17, 989 A.2d 733, 740 (quoting *Portland Water Dist.*, 2008 ME 23 121 ¶ 22, 834 A.2d at 1100) (quotations omitted). Where collateral estoppel is nonmutual, the party asserting the doctrine "must establish that the party to be estopped was a party or in privity with a party in the prior

7

proceeding. . . . The party resisting collateral estoppel has the burden of demonstrating that it would be prejudiced by its application." *Id.* ¶ 18, 989 A.2d at 740 (citing *Van Houten v. Harco Construction, Inc.,* 655 A.2d 331, 333 (Me. 1995)) (citations omitted).

"The purpose of collateral estoppel is to prevent harassing and repetitious litigation, to avoid inconsistent holdings which lead to further litigation, and to give sanctity and finality to judgments." *Hossler v. Barry,* 403 A.2d 762, 767 (Me. 1979) (citing *Cianchette v. Verrier,* 155 Me. 74, 151 A.2d 502 (1959)). It is "a flexible doctrine meant to serve the ends of justice," *id.* at 769, and must be applied on a case-by-case basis. *Beal,* 2010 ME 20, ¶ 17, 989 A.2d at 739 (citing *Van Houten,* 655 A.2d at 333).

The Stungers have brought this current suit in part to challenge the Fosters' alleged right to park two cars partially in Crystal Lane pursuant to a prescriptive easement. There is no question that this exact issue was tried and resolved in a prior lawsuit brought by Ms. Snow against the Fosters, nor that Ms. Snow's suit resulted in a valid final judgment on the merits. The Stungers were not parties to that earlier litigation, so res judicata will only apply if they were in privity with Ms. Snow. For the purposes of collateral estoppel, privity has been found where "two parties [had] a commonality of ownership, control, and interest in a proceeding." *Id.* ¶ 20, 989 A.2d at 740 (citing *Van Houten,* 655 A.2d at 333). It has also been found where two parties had "a mutual or successive relationship to the same rights of property." *N.E. Harbor Golf Club, Inc.,* 618 A.2d at 227. Substance controls over form. *Id.*

In *Beal v. Allstate Insurance Co.,* the plaintiff had been injured when another motorist negligently struck the car she was riding in. 2010 ME 20, ¶ 3, 989 A.2d at 736. The same company insured both the plaintiff and the negligent motorist. *Id.* The plaintiff's initial suit against the negligent motorist was resolved through binding arbitration, and the plaintiff's damages were found to exceed the limit of the motorist's

8

policy coverage. *Id.* ¶¶ 5–6, 989 A.2d at 737. Following arbitration, the plaintiff brought a second suit against her insurer to recover the balance of her damages under her own underinsured motorist policy coverage. *Id.* ¶ 7, 989 A.2d at 737. The court determined that the insurer "was collaterally estopped from relitigating the issue of total damages . . . as determined by the arbitrator." *Id.*

On appeal, the Law Court affirmed that the insurer could be collaterally estopped by the prior arbitration even though it was not a party in that proceeding. *Id.* ¶ 24, 989 A.2d at 741. The insurer had provided both parties with counsel and had been aware of the arbitration. *Id.* ¶ 21, 989 A.2d at 741. If allowed to relitigate the issue of damages, it would have substantially the same goal as the negligent motorist, i.e. to keep the plaintiff's damages as low as possible. *Id.*, 989 A.2d at 741–42. From this, the Court concluded that the insurer was in privity with the negligent motorist.

In another relevant case, a developer "submitted a proposed subdivision plan" to the town planning board for a parcel near a golf club. *N.E. Harbor Golf Club, Inc.*, 618 A.2d at 226. The board approved the proposal, and a local preservation committee appealed the ruling. *Id.* The zoning board of appeals affirmed the planning board's decision, as did the Superior Court. *Id.* When the committee did not appeal the Superior Court's decision, the golf club petitioned the planning board to reconsider its approval. *Id.* at 226–27. The board again approved the subdivision application, and the golf club appealed. Again, both the board of appeals and the Superior Court affirmed the planning board's approval. *Id.* at 227. Unlike the committee, the golf club appealed to the Law Court. *Id.*

The Court held that the doctrine of res judicata barred the golf club from "seeking further review of the [p]lanning [b]oard's ruling that was affirmed by the court in" the committee's original action. *Id.* The only issue was whether the committee

and the golf club were in privity with each other, and the Court answered in the affirmative. *Id.* The committee and its members had standing to challenge the planning board's decision for the same reasons as the golf club, i.e. both were injured by the increase in vehicle traffic and change in neighborhood character that would accompany the development. *Id.* Under the circumstances, it was "the mutual relationship of the [c]ommittee and the [g]olf [c]lub to the" development proposal that established "the commonality of interest justifying the application of res judicata to bar" the golf club's challenge. *Id.*

While it is difficult to draw any precise parallels from these precedents, the case at bar is sufficiently analogous to support a finding that the Stungers were in privity with Ms. Snow. The Stungers and Ms. Snow have identical, coequal rights in Crystal Lane relating back to the original subdivision plan. Given their mutual interest in the lane, they claim to have suffered the same harm: their access across the right-of-way is obstructed. While the Stungers claim the additional harm of being unable to obtain adequate insurance, they knew of this injury while Ms. Snow was suing the Fosters over the alleged obstruction. The Stungers were aware of that suit after being denied insurance but before the suit went to trial, and they and Ms. Snow were represented by the same law firm at that time. When Ms. Snow sued the Fosters, her goal was to prevent the Fosters from parking vehicles on the portion of their driveway that extends into Crystal Lane. The Stungers have the same goal now. Given the Stungers' and Ms. Snow's mutual interest in Crystal Lane, their substantially mutual injury, their mutual legal representation, their mutual goals, and the Stungers' knowledge of Ms. Snow's earlier suit before it went to trial, the court finds that they were in privity for the purposes of res judicata.

With privity between the Stungers and Ms. Snow established, all of the elements necessary for the application of claim preclusion have been met. To the extent that the Stungers are alleging the same causes of action brought by Ms. Snow, the final judgment in the Snow case precludes them from doing so.

Having found privity, the Stungers will be collaterally estopped from relitigating the issue of the easement if they had "a fair opportunity and incentive to litigate the issue in" Ms. Snow's prior proceeding, and they will not be prejudiced by the doctrine's application. *Beal*, 2010 ME 20, ¶¶ 17–18, 989 A.2d at 740. The Stungers have the burden of showing prejudice. *Id.* ¶ 18, 989 A.2d at 740. "[F]actors to consider when determining whether a party has had a full and fair opportunity to litigate a claim" include:

> the size of the claim, the forum of the prior litigation, whether the issue was a factual or a legal one, the foreseeability of future suits, the extent of the previous litigation, the availability of new evidence, the experience of counsel, indications of a compromise verdict, [and] procedural opportunities available in the second suit that were unavailable in the first.

*Id.* ¶ 17, 989 A.2d at 740 (quoting *Hossler*, 403 A.2d at 769).

Ms. Snow's prior claim against the Fosters was substantial and was resolved only after a full trial on the merits. The key issue in that trial was whether the Fosters have an enforceable property right to park cars in their driveway. The Stungers had objected to the parking arrangement for years prior to the initiation of Ms. Snow's action. They also knew about Ms. Snow's suit and knew what was at issue after they had been denied title insurance due to the parking, but before the commencement of trial. There is no indication that Ms. Snow lacked incentive to vigorously pursue her claims, and the Stungers had every incentive to see her succeed at the time. Ms. Snow was adequately represented in her action, by the same firm that now represents the Stungers. In fact, the firm was representing both parties simultaneously before and during Ms. Snow's trial.

11

Ms. Snow's action was resolved in this court, and the judgment was upheld when Ms. Snow appealed. There is no indication that the judgment was the result of a compromise or settlement. The Stungers do not have any procedural opportunities that were denied Ms. Snow, and they have not indicated that circumstances have changed since her action. Indeed, they indicate that they are prepared to advance substantially the same evidence and legal theories. Considering these factors in the light most favorable to the Stungers, it appears that they did have a full and fair opportunity to litigate their claim in tandem with Ms. Snow. The same factors show that the Stungers will not be prejudiced, unfairly or otherwise, by applying the doctrine of collateral estoppel to their attack on the Fosters' easement. *See id.* ¶ 23, 989 A.2d at 741 (factors establishing full and fair opportunity to litigate also show lack of prejudice).

There was privity between Ms. Snow and the Stungers, the Stungers had a full and fair opportunity to litigate their grievance during Ms. Snow's action, and they will not be prejudiced by the application of collateral estoppel. In Ms. Snow's prior action, this court held a full trial on the merits and issued a final judgment declaring that the Fosters have a prescriptive right to park cars in the portion of their driveway that encroaches on Crystal Lane. The Law Court affirmed that judgment on appeal. The Stungers are collaterally estopped from relitigating the existence Fosters' parking easement in this case.

The entry will be as follows:

On their Motion for Summary Judgment, Judgment for the Fosters.

Dated:        November **3** , 2010

G. Arthur Brennan
Justice, Superior Court

12

ATTORNEY FOR PLAINTIFFS WALTER R STUNGER & LAURIE MACDONALD-STUNGER:

David R. Ordway, Esq.
SMITH ELLIOTT SMITH & GARMEY
199 MAIN STREET
PO BOX 119
SACO, ME    04072


ATTORNEY FOR DEFENDANTS ROSE ANN & DONALD SMITH:

James B. Smith, Esq.
WOODMAN EDMANDS DANYLIK & AUSTIN
PO BOX 468
BIDDEFORD, ME    04005-0468


ATTORNEY FOR PII JUDITH A. & TIMOTHY R. FOSTER:

Brian D. Willing, Esq.
DRUMMOND WOODSUM & MACMAHON
84 MARGINAL WAY  SUITE 600
PORTLAND, ME    04101


PRO-SE PARTIES IN INTEREST:

Denis & Deborah Litalien
9 Lynn Avenue
Biddeford, ME    04005

Robert C. & Jean N. Waltz
PO Box 539
Townsend, MA    01469